UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
JANE DOE,                               )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )    C.A. No. 20-500 WES
                                        )
ORDER OF ST. BENEDICT IN                )
PORTSMOUTH, RHODE ISLAND, ET AL.,       )
                                        )
        Defendants.                     )
_____)

### MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

    This case was brought by a victim of child sexual abuse against a well-known, Rhode Island-based preparatory and boarding school, Portsmouth Abbey School, the institution that hired and retained her abuser. The gravamen of the complaint is that the school administrators failed to report and prevent Plaintiff Jane Doe's abuse despite receiving warnings. See generally Am. Compl., ECF No. 11. Defendant Order of St. Benedict in Portsmouth, Rhode Island ("Defendant") is the owner and operator of the school Plaintiff attended; it moves for summary judgment, arguing that Plaintiff's claims against it, as an alleged non-perpetrator of sexual abuse, are barred by the applicable statute of limitations. Plaintiff Doe opposes the motion, arguing Defendant should be barred from asserting the statute of limitations as a defense

because its conduct prevented her from bringing a timely cause of action against it. Alternatively, Plaintiff argues that the statute of limitations should be tolled, equitably or under the fraudulent concealment statute, because of Defendant's misconduct. While the facts of the case are clearly troubling, Plaintiff's claims are procedurally barred by the statute of limitations, and none of the equitable exceptions she cites can overcome that bar. For the reasons below, Defendant's Motion is GRANTED.

## I. BACKGROUND[1]

Plaintiff attended high school at Portsmouth Abbey School ("PAS") - a Catholic, Benedictine coeducational boarding and day school owned and operated by Defendant in Portsmouth, Rhode Island - for four years between September 2010-May 2014. Def.'s Statement Undisputed Facts ("DSUF") ¶¶ 1, 3, ECF No. 64. While attending PAS, Plaintiff's teacher, Michael Bowen Smith, who was fifty years old at the time, sexually abused her between sophomore year and graduation. Pl.'s Statement Undisputed Facts ("PSUF") ¶¶ 224-25, ECF No. 70; DSUF ¶¶ 12-13; Pl.'s Statement Disputed Facts ("PSDF") 3, ECF No. 69. She turned eighteen in October 2014. DSUF ¶ 5. Plaintiff terminated her "relationship" with Smith in January

---

[1] The following facts are undisputed unless otherwise noted. The Court views any disputed facts in a light most favorable to Plaintiff as the non-moving party. <u>Taite v. Bridgewater State Univ., Bd. of Trs.</u>, 999 F.3d 86, 92 (1st Cir. 2021).

2015.  Id. ¶ 14.

### A. Events of 2015

In Spring 2015, during her college spring break, Plaintiff disclosed to her parents that Smith abused her.  Id. ¶ 12. Plaintiff's mother, Mrs. Doe, reacted to this news by sending an email to PAS Headmaster Daniel McDonough and then speaking with him over the phone.  Id. ¶¶ 20-22; PSUF ¶ 228.  McDonough requested that Mrs. Doe provide him any evidence she had of the relationship including emails.  DSUF ¶ 23.  Assistant Headmaster Perreira was made Mrs. Doe's contact person.  Id. ¶ 25.  McDonough informed PAS's external legal counsel, Marc DeSisto, of Mrs. Doe's report. Id. ¶ 28.

Mrs. Doe provided Perreira the email communications between Plaintiff and Smith in which he used an alias.  Id. ¶ 30; PSUF ¶ 229.  McDonough found them to be sexual in nature and indicative of a sexual relationship.  PSUF ¶ 229; DSUF ¶ 31.  Contrary to Mrs. Doe's wishes, DeSisto advised that the school had a legal obligation to inform law enforcement.  DSUF ¶¶ 24, 32.  DeSisto reported the matter to the Portsmouth Police Department ("PPD"), the R.I. Attorney General's Office ("RIAG"), and the R.I. Department of Children, Youth, and Families ("DCYF").  Id. ¶¶ 32-33.  PPD investigated the matter confidentially, which included an interview of Plaintiff, but did not bring charges.  See id. ¶¶ 54-65, 77-93.

On May 2, 2015, Perreira called Plaintiff to discuss the evidence Mrs. Doe provided.  Id. ¶ 37.  During the ten-minute call, Plaintiff confirmed that Smith sent emails using an alias.  Id. ¶¶ 38-39.  This May 2 call was the only communication between Plaintiff and any PAS administrator up until the filing of this lawsuit.  Id. ¶¶ 41-42.

Later that day, Perreira and DeSisto met with Smith concerning the allegations and informed him that he was being suspended pending an investigation.  Id. ¶¶ 43-46.  A few hours later, Smith tendered his resignation, effective immediately, which McDonough accepted.  Id. ¶¶ 47-48.

The following week, Perreira consulted Timothy Flynn, the managing director of the Freeh Group.  PSUF ¶ 232; DSUF ¶¶ 66-68. The Freeh Group is a firm that provides legal and investigative services to companies, schools, and organizations.  PSUF ¶ 232; DSUF ¶ 69.  Their clients include entities affiliated with the Catholic Church.  PSUF ¶ 234.  PAS sought Flynn's advice regarding how to best investigate, and respond to external communications concerning, Smith's misconduct.  PSUF ¶¶ 234-35; DSUF ¶ 71.

Flynn and Perreira met on May 8, 2015.  PSUF ¶ 234; DSUF ¶ 72.  A consultant named Kathleen McChesney accompanied Flynn to this meeting.  PSUF ¶¶ 233-34; DSUF ¶ 72. McChesney is a consultant who operates a sole proprietorship called Kinsale Management.  PSUF ¶ 233; DSUF ¶¶ 72, 74.  McChesney served twenty-five years in the

Federal Bureau of Investigation and assisted the United States Conference of Catholic Bishops ("USCCB") in developing the "Dallas Charter," a document that outlined guidelines on how to protect children from abuse within Catholic ministries.   DSUF ¶ 74. Kinsale Management advises organizations, many of which are affiliated with the Catholic Church, on how to respond to reports of child sex abuse.   PSUF ¶ 234; DSUF ¶ 74.

### B. Events of 2016

By January 2016, Plaintiff moved to her familial home in New Mexico.   DSUF ¶¶ 11, 107.   Around this time, Smith began to stalk, and attempted to contact, Plaintiff.   Id. ¶ 108.   Smith's actions prompted Mrs. Doe to reach out to Perreira for help in stopping Smith.   PSUF ¶¶ 237-38; DSUF ¶¶ 108-09.   Mrs. Doe did this because McDonough had offered himself and Perreira as future resources following Mrs. Doe's 2015 report.   DSUF ¶¶ 102, 110.   During her deposition, Mrs. Doe testified that she believed that PAS had DeSisto contact Smith.   Id. ¶ 109.

### C. Events of 2017

Plaintiff filed pro se an ex parte application for a temporary restraining order ("TRO") against Smith on February 13, 2017, in a New Mexico state court, to stop his efforts to contact her.   Id. ¶¶ 113-14.   The judge denied Plaintiff's request for a TRO, required Plaintiff to serve process on Smith, and set a hearing for March 7, 2017.   Id. ¶ 116.

Mrs. Doe again reached out to Perreira in mid-February and requested assistance in stopping Smith's stalking. Id. ¶¶ 117-19. McDonough, Perreira, and DeSisto met to discuss Mrs. Doe's request. PSUF ¶ 239; DSUF ¶ 120; Def.'s Resp. Pl.'s Statement Undisputed Facts ("RPSUF") ¶ 239, ECF No. 76. The three of them discussed how Plaintiff was probably going to sue PAS and were actually surprised that it not been sued already. PSUF ¶ 240; RPSUF ¶ 250. Yet they still believed that they should help Plaintiff. RPSUF ¶ 240; DSUF ¶ 122; PSDF 5. They also considered telling Mrs. Doe that PAS could not help her. PSUF ¶ 241; RPSUF ¶ 241. The three of them, however, did not know any lawyers in New Mexico who could help. DSUF ¶ 121. They agreed that PAS would pay Plaintiff's legal fees for obtaining the TRO. Id. ¶ 124.

PAS decided that one way it could help Plaintiff was to connect Mrs. Doe to the Freeh Group.[2] PSUF ¶ 242; DSUF ¶ 123. They hoped it had contacts in New Mexico. DSUF ¶ 123. Perreira

---

[2] The parties dispute whether anyone from PAS informed Mrs. Doe of the Freeh Group's purported conflict of interest given that it assisted PAS in its investigation of Mrs. Doe's report. Plaintiff asserts that Mrs. Doe was never informed. PSUF ¶ 249; PSDF 6. Defendant disputes this, noting that Perreira informed Mrs. Doe in 2015 that he was consulting the Freeh Group as part of PAS's investigation. DSUF ¶ 70; RPSUF ¶¶ 236, 243. In his email to Flynn concerning Mrs. Doe's request for assistance, Perreira stated, "I mentioned the Freeh Group with disclosure that you may or may not be able to help but mom said she understood the conflict." PXH, Perreira Email to Flynn (Feb. 14, 2017), ECF No. 71-7.

reached out to Flynn and explained the situation, but the Freeh Group declined to take on the matter because of a conflict. PSUF ¶¶ 244-45; RPSUF ¶ 245. Instead, Flynn referred Perreira's inquiry to McChesney.[3] PSUF ¶ 245; DSUF ¶ 126; RPSUF ¶ 245. Ultimately, Perreira referred Mrs. Doe to Flynn who then referred Mrs. Doe to McChesney. PSUF ¶ 247; DSUF ¶ 127.

McChesney accepted the referral. DSUF ¶ 128; PSUF ¶¶ 258-59. She and Perreira agreed that PAS would pay for her services. PSUF ¶ 259; DSUF ¶¶ 128-37. They signed a Letter of Engagement for services she would provide to Plaintiff on PAS's behalf.[4] PSUF ¶¶ 259-60, 262-64; DSUF ¶¶ 139, 146, 148-49. The scope of McChesney's work was "to provide confidential assistance" which included "conducting an interview of the alumna, obtaining information from various sources regarding a former PAS faculty member, locating and interviewing the former PAS faculty member, and . . . directing him to have no further contact with the alumna." DSUF ¶ 149 (quoting DXBB, Letter of Engagement (Feb. 23, 2017),

---

[3] In an email to Flynn following a conversation where Flynn informed Perreira that he decided to refer the matter to McChesney, Perreira stated, "As you said, perhaps an attorney is not the best way to go?" PXJ, Perreira Email to Flynn (Feb. 18, 2017), ECF No. 71-9. Flynn and Perreira previously discussed bringing in an investigator rather than an attorney. PXG, Flynn Dep. at 38, ECF No. 71-6.

[4] The Parties agreed at the December 7, 2023, hearing on Defendant's Motion that, by signing the Letter of Engagement, McChesney became an agent of PAS.

ECF No. 64-28).

Subsequently, Mrs. Doe asked McChesney if she knew of any law firms or lawyers in New Mexico. Id. ¶ 150. McChesney reached out to Scott Browning, a partner at the law firm of Lewis Roca and the head of the firm's Religious Institutions group. PSUF ¶ 278. The firm regularly represents Catholic diocese and institutions against claims of child sexual abuse. Id. ¶¶ 275, 277-80. Previously, McChesney and Browning collaborated with each other in an investigation of sexual abuse and misconduct involving a religious organization in Peru. Id. ¶ 276.

McChesney informed Browning of Plaintiff's legal needs. DSUF ¶¶ 151-52. He referred her to two attorneys in the firm's Albuquerque office – Dennis Jontz and Bobbie Collins. PSUF ¶¶ 294-95; DSUF ¶ 153. McChesney proceeded to connect Mrs. Doe and Plaintiff to Jontz and Collins by email. PSUF ¶ 274; DSUF ¶¶ 128-37. Collins – an associate in the firm's litigation group - was the primary attorney on Plaintiff's matter. PSUF ¶ 295. Plaintiff informed Collins that PAS would pay for her legal services.[5] Id. ¶ 296; DSUF ¶ 158. Plaintiff signed Lewis Roca's engagement letter

---

[5] Perreira noted in an email to McChesney that paying for the legal fees "could present some legal challenges." PXD, Perreira Email to McChesney (Feb. 22, 2017) 3, ECF No. 71-5. Perreira testified that he was referring to both the logistics of paying the law firm and the fact that the law firm could sue PAS. PSUF ¶¶ 284-85; DSUF ¶ 138; PSDF 6.

on March 2, 2017, the scope of which encompassed obtaining a TRO against Smith.  DSUF ¶¶ 159-60, 164.

DeSisto called Collins on March 2, 2017, to discuss paying for the firm's retainer and Collins's legal services.  PSUF ¶ 300; DSUF ¶ 171.  In an email memorializing their conversation, Collins instructed DeSisto on how PAS should pay the retainer.  PSUF ¶ 304; DSUF ¶ 171.  Collins also confirmed that she would send DeSisto publicly-filed pleadings to substantiate that her work was limited to the TRO.[6]  DSUF ¶¶ 176-77.

While consulting Collins, Plaintiff and McChesney discussed Plaintiff's options on how to stop Smith from contacting her.  Id. ¶ 179.  They agreed that one of McChesney's colleagues would deliver a cease-and-desist letter signed by Plaintiff to Smith. Id. ¶¶ 181-82.  After McChesney's associate served the letter, her work ended.  Id. ¶¶ 186-88.  McChesney and Plaintiff never discussed suing Smith or PAS or any applicable statute of

---

[6] Plaintiff contends DeSisto "limited," and "asserted control" over Collins's representation of Plaintiff.  Pl.'s Statement Disputed Facts ("PSDF") 8-9, ECF No. 71-1; see Pl.'s Statement Undisputed Facts ("PSUF") ¶¶ 302-03, ECF No. 70.  Defendant disputes this.  Def.'s Resp. Pl.'s Statement Undisputed Facts ("RPSUF") ¶¶ 301-03, ECF No. 76.  Plaintiff's assertion, however, does not have support in the record as Collins testified in her deposition that DeSisto did not place any limitations on her representation.  See PXWW, Collins Dep. 125-26, 130, 177, ECF No. 76-3.  In fact, Collins testified, if Plaintiff required representation for a separate issue, she "could have very easily just opened a second matter for her."  Id. at 125-26.

limitations.  PSUF ¶ 272.

Collins communicated with Plaintiff on April 30, 2017, and informed her that she was concerned that they lacked sufficient evidence to obtain a TRO.[7]  DSUF ¶ 190.  She believed that, if her renewed request was denied, there was a risk that Smith could file a malicious prosecution claim against her.  PSUF ¶ 308.  Collins proposed sending a demand letter instead.  DSUF ¶ 191.  Plaintiff dismissed the idea out of fear it would only instigate Smith to reach out again.  Id. ¶ 194.  In response, Collins emailed that she would hold Plaintiff's matter open until November 1, 2017, and asked Plaintiff to let her know if Smith reached out again.  Id. ¶ 195.  Over the course of the representation, Collins and Plaintiff never discussed suing PAS or any applicable statute of limitations even though Collins had knowledge of what Smith had done to Plaintiff while she was a student.  PSUF ¶¶ 299, 306.

On November 2, 2017, Collins emailed Plaintiff to inform her that, because she had not heard from her, she would close out the matter.  Id. ¶ 310; DSUF ¶ 206.  Collins sent Plaintiff a final closing letter in March 2018.  PSUF ¶ 310; DSUF ¶ 208.

**D. Events between 2018-2020**

After Collins's March 2018 letter, there were no

---

[7] Plaintiff asserts that Collins had more than enough evidence to obtain a TRO.  PSDF 9.

communications between Plaintiff and McChesney, Collins, or anyone at PAS.

In June 2020, Plaintiff was pursuing her Ph.D at the ██████████████████████████ ("███"). DSUF ¶ 215. While there, Plaintiff learned that Smith had contacted some of her graduate school advisers and faculty members to find a way to connect with Plaintiff. PSUF ¶ 315; DSUF ¶ 216. When she learned of Smith's entreaties, she visited the ███ student legal services center for help. PSUF ¶ 315; DSUF ¶ 217. Representatives from legal services said they could not help beyond obtaining a TRO and providing her with campus security. DSUF ¶ 217. They recommended she search the Internet for law firms that specialize in sexual harassment and sexual abuse. PSUF ¶ 315; DSUF ¶ 217. In searching for law firms, Plaintiff came across her present litigation counsel and, for the first time, considered suing PAS. PSUF ¶ 315; DSUF ¶¶ 218-19. She retained litigation counsel in July 2020 and filed her lawsuit in December 2020. DSUF ¶ 219; see Compl., ECF No. 1.

Plaintiff filed an Amended Complaint on December 21, 2020, which Defendant moved to dismiss. See Am. Compl.; Def.'s Mot. Dismiss, ECF No. 18. Defendant's motion was granted only to the extent Plaintiff's negligence claim relied on an alleged duty Defendant owed to Plaintiff after she graduated. See Mem. & Order 7, ECF No. 27. Otherwise, it was denied.

## II. LEGAL STANDARD

Summary judgment is warranted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see IDC Props., Inc. v. Chi. Title Ins. Co., 42 F.4th 1, 7 (1st Cir. 2022). "In ruling on the motion[,] the . . . [C]ourt must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (quoting Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)).

The movant bears the initial burden of establishing that there is no genuine issue of material fact, and, if that burden is met, the burden shifts to the non-movant who avoids summary judgment only by providing properly supported evidence of disputed material facts that require a trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986); Fed. Ins. Co. v. Russell L. Sisson & Sons, C.A. No. 18-441-WES, 2021 WL 4263624, at *1 (D.R.I. Sept. 20, 2021).

"[M]ere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247–48 (1986) (emphasis omitted). "A dispute is 'genuine' if 'the

evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." Id. at 23 (citation omitted).  "A court will disregard 'conclusory allegations, improbable inferences, and unsupported speculation' in determining whether a genuine factual dispute exists."  Id. at 24 (quoting Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009)). Rule 56 plainly allows for the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; see Vineberg v. Bissonnette, 529 F. Supp. 2d 300, 302 (D.R.I. 2007).

A federal court sitting in diversity is constrained to apply state substantive law.  Shay v. Walters, 702 F.3d 76, 79 (1st Cir. 2012) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). The parties do not dispute that Rhode Island law applies.  Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") 12, ECF No. 63; see generally Pl.'s Mem. Supp. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Mem."), ECF No. 68 (applying Rhode Island law); see also Henry v. Sheffield, 856 F. Supp. 2d 345, 352 n.5 (D.R.I. 2012) (noting that

state law governs the applicability of the statute of limitations). When the Rhode Island Supreme Court has not ruled on an issue, federal courts are instructed to predict what path the state court would most likely travel accounting for the precedents of other jurisdictions. Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 9 (1st Cir. 2018); Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 65 (1st Cir. 2001).

## III. DISCUSSION

In Rhode Island, the statute of limitations for lawsuits that involve "injuries to the person," broadly speaking, begins to accrue on the date of the injury for a period of three years. R.I. Gen. Laws § 9-1-14(b). If the injury occurs while the plaintiff is a minor, the statute of limitations is tolled until the plaintiff reaches the age of majority, which is eighteen years of age. Id. § 9-1-19.

In 2019, the General Assembly changed the statute of limitations paradigm for claims involving child sexual abuse. Since 1993, the statute of limitations for child sexual abuse claims involving perpetrator defendants was seven years from "the act alleged to have caused the injury or condition" or from "the time the victim discovered or reasonably should have discovered that the injury or condition was caused by said act."[8]  1993 R.I.

---

[8] Before the Rhode Island General Assembly amended the statute of limitations for child sex abuse claims in 2019 ("the 2019

Pub. Laws Ch. 93-274, § 1.  The 2019 Amendment extended the statute of limitations for child sexual abuse claims to thirty-five years from the day the injury to the minor occurred.  R.I. Gen. Laws § 9-1-51(a)(1).  It also applied the new statute of limitations to non-perpetrator defendants.[9]  Id. § 9-1-51(a)(2); see 2019 R.I. Pub. Laws Ch. 19-83, § 1.  The statute of limitations for non-perpetrator defendants, however, only applies prospectively:

> Except as provided in subsection (a)(3) herein, any claim or cause of action based on conduct of sexual abuse or conduct that caused or contributed to sexual abuse, if the action is not otherwise time-barred under previous version of the general laws on the effective date of this section, may be commenced within the time period enumerated in subsections (a)(1) and (a)(2) of this section.

R.I. Gen. Laws § 9-1-51(a)(4) (emphasis added).  By contrast, the thirty-five-year statute of limitations for claims against perpetrator defendants applies retroactively, effectively resurrecting previously lapsed claims.[10]  Id. § 9-1-51(a)(3).

---

Amendment"), "[u]nder § 9-1-14(b), a cause of action for childhood sexual abuse accrues on the date of injury." Kelly v. Marcantonio, 187 F.3d 192, 195 (1st Cir. 1999); see Kelly v. Marcantonio, 678 A.2d 873, 877 (R.I. 1996).

[9] A non-perpetrator is one whose "conduct caused or contributed to the childhood sexual abuse by another person." R.I. Gen. Laws § 9-1-51(a)(2); Houllahan v. Gelineau, 296 A.3d 710, 721 (R.I. 2023) (emphasis omitted).  Liable conduct includes "neglect or default in supervision, hiring, employment, training, monitoring, or failure to report and/or the concealment of sexual abuse of a child."  R.I. Gen. Laws § 9-1-51(a)(2).

[10] The 2019 Amendment rendered § 9-1-14(b) inapplicable to childhood sexual abuse claims that accrue after the law went into effect in July 2019.  2019 R.I. Pub. Laws Ch. 19-83, § 1

Following the law's passage, the Rhode Island Supreme Court held that "claims against non-perpetrator defendants that were time-barred under previous versions of the General Laws were not revived under the 2019 Amendment to § 9-1-51." Houllahan v. Gelineau, 296 A.3d 710, 720 (R.I. 2023).

Defendant argues that Plaintiff's claims are timed barred under R.I. General Laws § 9-1-14(b) because she did not bring a claim against it by October 2017, three years from when she turned eighteen years of age. Def.'s Mem. 13-14, 19-25. Plaintiff avers that three equitable theories prevent Defendant from invoking the statute of limitations defense. First, she argues the doctrine of equitable estoppel bars Defendant from asserting the statute of limitations as a defense.[11] Second, as an alternative, Plaintiff argues that Defendant's conduct requires the statute of limitations to be equitably tolled from February 2017 to, at least, November 2018.[12] Pl.'s Mem. at 6-8, 11-22. And finally, relying on § 9-1-20, Plaintiff argues that Defendant fraudulently concealed Plaintiff's claims, allowing Plaintiff's claims to be

_____

("Notwithstanding anything herein, any claim based on sexual abuse or exploitation of a child shall be governed by § 9-1-51.").

[11] The question of whether equitable estoppel should apply, when the facts are dispute, is one that is resolved by a jury. Faella v. Chiodo, 111 A.3d 351, 358 (R.I. 2015).

[12] The application of equitable tolling is reserved for the Court's equitable discretion. Polanco v. Lombardi, 231 A.3d 139, 155 (R.I. 2020); see Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 38 (1st Cir. 2001).

tolled to, at least, November 2018.[13]  Id. at 22-24.  The Court
will address each of these arguments in turn.

### A. Equitable Estoppel

Under the doctrine of equitable estoppel, "[a] defendant may
be estopped from pleading the statute of limitations on the ground
that representations were made for the purpose of inducing the
plaintiff to rely thereon when the plaintiff did in fact so rely
on the representations to his injury."  Wolf v. S.H. Wintman Co.,
169 A.2d 903, 905 (R.I. 1961); see also Phelps v. Fed. Emergency
Mgmt. Agency, 785 F.2d 13, 16 (1st Cir. 1986) ("Equitable estoppel
is a judicially-devised doctrine which precludes a party to a
lawsuit, because of some improper conduct on that party's part,
from asserting a claim or a defense, regardless of its substantive
validity."); E. Greenwich Yacht Club v. Coastal Mgmt. Res. Council,
376 A.2d 682, 686 (R.I. 1977) ("The key element of an estoppel is
intentionally induced prejudicial reliance." (citation omitted)).
To benefit from the doctrine, the plaintiff must make a "showing
of an express representation or other affirmative conduct which
amounts to a representation that could reasonably deceive another

---

[13] It is unclear whether, under Rhode Island law, a finding
of fraudulent concealment is a question for a judge or a jury.  In
Massachusetts, which has a similar fraudulent concealment statute,
see Mass. Gen. Laws ch. 260, § 12, when its application turns on
a question of disputed fact, those facts must be resolved by a
jury.  Mahoney v. Wells Fargo Bank, N.A., C.A. No. 18-11593-MBB,
2022 WL 1446934, at *9 (D. Mass. Mar. 25, 2022).

and induce a reliance that would work to the disadvantage of the individual relying upon the representation." Gross v. Glazier, 495 A.2d 672, 673-74 (R.I. 1985). The doctrine's application cannot be based on "mere inaction or silence by a person who has no obligation to speak or act in the particular situation." Id. at 673.

Equitable estoppel "is extraordinary relief, which will not be applied unless the equities clearly are balanced in favor of the party seeking relief." Loffredo v. Shapiro, 274 A.3d 782, 793 (R.I. 2022) (citation omitted) (internal edits omitted). It is "not a favored doctrine . . . [and should be] applied carefully and sparingly and only from necessity." Id. (quoting Faella v. Chiodo, 111 A.3d 351, 357 (R.I. 2015)). As such, "[e]ach of the elements of [equitable] estoppel must be proved with the requisite degree of certainty; no element may be left to surmise, inference, or speculation."[14] Id. (quoting Faella, 111 A.3d at 357).

---

[14] Defendant argues equitable estoppel is a tolling doctrine rather than an absolute bar to the statute of limitations defense. Def.'s Mem. Support Mot. Summ. J. ("Def.'s Mem.") 28-29, ECF No. 63; Def.'s Reply 13-16, ECF No. 75. It asks the Court to revisit its previous assertion that "equitable estoppel is not a tolling theory and instead bars an offending party from asserting a statute of limitations defense altogether." Mem. & Order 5, ECF No. 27; see Def.'s Mem. 28; Def.'s Reply 13. In support, Defendant principally relies on the last sentence of a section on equitable estoppel in Houllahan v. Gelineau where the Rhode Island Supreme Court held "the statute of limitations is not tolled under theories of equitable estoppel or fraudulent concealment but is counted among the sins of silence committed by these defendants." 296 A.3d at 725. As such, Defendant invites the Court to conduct a

tolling analysis, rather than impose an absolute bar, if it were to find that equitable estoppel applies.  Def.'s Mem. 29.

In Houllahan, the Rhode Island Supreme Court neither affirmatively explains that, in fact, equitable estoppel is a tolling doctrine rather than a bar nor did the parties brief the question.  See United States v. London, 66 F.3d 1227, 1241 (1st Cir. 1995) (internal citation omitted) ("We do not normally take [] opinions to contain holdings on matters the Court did not discuss and which, presumably, the parties did not argue.").  The sentence on which Defendant relies is not substantiated by a citation nor did the court of last resort quote or cite to a case holding or explaining that the doctrine of equitable estoppel is a tolling doctrine. See Houllahan, 296 A.3d at 724-25.  In fact, in its section on equitable estoppel, the Houllahan court quotes the language of Wolf v. S.H. Wintman Company which explained that "[a] defendant may be estopped from pleading the statute of limitations" if equitable considerations so require.  Id. (quoting 169 A.2d 903, 905 (R.I. 1961)) (emphasis added).  The definition of "estop" means "[t]o bar or prevent by estoppel."  Black's Law Dictionary (11th ed. 2019).

Defendant appears to put too much stock in the lone sentence in Houllahan when other cases go on to explain that equitable estoppel is a bar to the statute of limitations defense.  See, e.g., Benitez-Pons v. Com. of P.R., 136 F.3d 54, 63 (1st Cir. 1998); Phelps v. Fed. Emergency Mgmt. Agency, 785 F.2d 13, 16 (1st Cir. 1986); Henry, 856 F. Supp. 2d at 352; Wolf, 169 A.2d at 905. Moreover, equitable estoppel cannot be a mere tolling doctrine given that it has been considered outside of the statute of limitations context.  See, e.g., Eddy v. Pascoag Fire Dist., 266 A.3d 747, 750-52 (R.I. 2022) (considering whether the defendant should be equitably estopped from arguing that the plaintiff failed to exhaust his administrative remedies, requiring dismissal); Faella, 111 A.3d at 357-58 (applying equitable estoppel to whether the town should be estopped from denying the viability of an insurance plan agreement); Ret. Bd. of Emps.' Ret. Sys. of State v. DiPrete, 845 A.2d 270, 284 (R.I. 2004) (finding the plaintiff cannot be equitably estopped from bringing a revocation action for the defendant's pension); Prov. Teachers Union v. Prov. Sch. Bd., 689 A.2d 388, 391-92 (R.I. 1997) (considering whether the defendant should be "equitably estopped from denying the validity of the contract").  Defendant and the court in Houllahan conflate the two concepts which are conceptually similar, especially in the context of the statute of limitations defense.  See Rivera v. Emps.' Ret. Sys. of R.I., 70 A.3d 905, 913 n.11 (R.I. 2013).  Nevertheless,

In support of its argument, Defendant points out that no one from PAS made any express representations to Plaintiff concerning her alleged claims against it.  Def.'s Mem. 31-32.  From when she turned eighteen through when she filed her lawsuit, there was only one communication between her and anyone at PAS.  That communication occurred when Plaintiff spoke with Perreira on May 2, 2015, concerning Mrs. Doe's report.  This lack of communication, according to Defendant, between Plaintiff and anyone at PAS cannot justify applying equitable estoppel because silence, absent a duty, does not constitute a misrepresentation.

Plaintiff's theory of equitable estoppel, however, does not rely on a misrepresentation.  See Pl.'s Mem. 13-19.  Rather, Plaintiff argues that Defendant's "affirmative conduct" "amount[ed] in fact to such a representation" on which Plaintiff relied to her detriment.  Id. at 11-12 (citing Gross, 495 A.2d at 673-74).  Moreover, Plaintiff's theory does not rely on the idea that PAS had a duty to inform Plaintiff that she had a potential cause of action against PAS.  Instead, she argues, Defendant engaged in a "scheme" to "lull Plaintiff into losing her right to bring a civil lawsuit against the school" by directing her to individuals who had conflicting interests and were unlikely to

---

the lone sentence in Houllahan does not convince the Court that it should revisit its previous statement on equitable estoppel.

recommend that she sue Defendant.  Id. at 17-18.

This purported scheme is revealed by two events.  First, after Mrs. Doe reached out to PAS for assistance in February 2017, Perreira referred Plaintiff to the Freeh Group – the same organization that assisted PAS's investigation of Mrs. Doe's report in May 2015.  Flynn of the Freeh Group then referred Plaintiff to McChesney because of a conflict.  McChesney is the consultant who advised the USCCB and consults Catholic organizations on preventing child sexual abuse.  McChesney referred Plaintiff to the Lewis Roca law firm – the same law firm that represents Catholic institutions against child sexual abuse claims – for assistance in securing a TRO against Smith.

The second event occurred when DeSisto contacted Collins concerning PAS's payment of legal fees.  On the same day Plaintiff signed an engagement letter, DeSisto called Collins to coordinate the payment of the retainer.  Collins testified that DeSisto wanted her to only bill PAS for legal services related to the TRO.  To substantiate her work, Collins agreed to provide DeSisto with publicly-filed pleadings.  Plaintiff asserts DeSisto deliberately limited Collins's representation of Plaintiff during this exchange.[15]

---

[15] Even viewing DeSisto's interaction with Collins in a light most favorable to Plaintiff, the Court does not find the exchange to be in any way nefarious.  Third parties often pay for legal services on behalf of individuals who may have interests that

Plaintiff's argument relies entirely on unsupported speculation. It is doubtlessly true, as counsel articulated at the December 7, 2023, summary judgment hearing, that at no point was Plaintiff directed towards "conflict-free" advice. McChesney and the Lewis Roca have a history of working for and consulting Catholic institutions on matters relating to child sexual abuse. It is hard to imagine either McChesney, Browning, or Collins advising Plaintiff that she may have a claim against PAS, a preeminent Catholic school. They know what side their bread is buttered on. What is missing, however, is some affirmative link between PAS and the collective silence of Browning and Collins. It is difficult to imagine how experienced counsel would not advise a client about the range of options that might be available to her to address a case of sexual abuse such as this, or, at a minimum, to refer her to counsel that would do so if they felt conflicted. But even so, there is nothing in the record suggesting PAS directed

---

conflict with the payor. See R.I. Rule Prof'l Conduct 1.7 cmt. 12 (citing Rule 1.8(f)) ("A lawyer may be paid from a source other than the client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client."); e.g., Hartford Cas. Ins. Co. v. A & M Assocs., Ltd., 200 F. Supp. 2d 84, 92-93 (D.R.I. 2002). It is not clear to the Court whether Collins properly informed Plaintiff of the arrangement and obtained her consent. The questions regarding Lewis Roca's potential breach of duties are not before this Court. In any event, Collins testified that DeSisto never limited her representation. DXWW at 130, 177, ECF No. 76-3.

or encouraged the silence.  Taken all together, under Rhode Island law, Perreira's, McChesney's and DeSisto's (PAS's agents) actions are not "affirmative conduct" that amounts to a misrepresentation as Plaintiff argues.

The case of McNulty v. City of Providence, 994 A.2d 1221 (R.I. 2010), where the plaintiff fell on a sidewalk, injured herself, and then reported her injuries to the city clerk to file a claim, reached a similar result.  When the plaintiff met with the city clerk, she gained the impression that, if she were to file her claim before her medical treatment concluded, it would be marked incomplete.  Id. at 1222-23.  Plaintiff had sixty days to file a claim from when she was injured.  Id. at 1223.  She completed her medical treatment, filed her claim, and the city denied the claim as untimely.  Id. The Rhode Island Supreme Court found equitable estoppel inapplicable to the city's statute of limitations defense because the city did not make an "affirmative representation" or "engage[] in 'equivalent conduct'" that would justify estoppel. Id. at 1225 (quoting Prov. Teachers Union v. Prov. Sch. Bd., 689 A.2d 388, 391-92 (R.I. 1997)).  "It is uncontested that there were no explicit instructions or directives made on behalf of the city as to the time within which the plaintiff would have to file a claim; it follows that there were no affirmative representations upon which the plaintiff could have detrimentally relied."  Id. (emphasis omitted).

In contrast, Gross v. Glazier is a case where the Rhode Island Supreme Court found equitable estoppel appropriate.  495 A.2d at 672-75.  There, the plaintiff had twenty out of one hundred shares of a family business; the other eighty were equally distributed among his father and the plaintiff's three siblings.  Id. at 672-73.  The father transferred his twenty shares to the plaintiff prior to passing.  Id.  The plaintiff entered into an agreement with his three siblings in which he would convey land to the family business in exchange for five shares from each sibling.  Id. at 673.  The siblings agreed, and the plaintiff, now having what he believed was majority control, operated the business.  Id.  Nineteen years later, the siblings challenged the plaintiff's status as the majority stockholder.  Id.  They argued that the fifteen shares he received from the siblings were satisfied out of the twenty shares the plaintiff received from the late father.  Id.  According to the defendants, the father's shares were part of an oral trust that reverted the shares back to the siblings upon his death.  Id.  The plaintiff sued to compel the conveyance of fives shares from each sibling.  Id.  The siblings argued that the statute of limitations barred the plaintiff from challenging the purported stock distribution.  Id.  The Rhode Island Supreme Court affirmed the lower court's decision to estop the defendants from asserting a statute of limitations defense because "by their conduct" the defendants let the plaintiff "believe that they

24

acquiesced in his belief that he had majority control and ownership of the corporation." Id. In other words, the defendants "lull[ed]" plaintiff into believing that he had majority control. Id. at 675.

The holdings in McNulty and Gross demonstrate that, for a party to benefit from equitable estoppel, it must produce evidence of the defendant making an explicit misrepresentation or engaging in conduct that made the plaintiff believe something that is not true. In McNulty, equitable estoppel was unavailable because the clerk did not explicitly tell the plaintiff that she had to complete her medical treatment before she could file a claim. 994 A.2d at 1222-23. The plaintiff's incorrect belief was formed by what the clerk implied. By contrast, the court in Gross found equitable estoppel appropriate because, when the defendants initially relinquished their five shares to the plaintiff, they caused the plaintiff to believe he had majority control of the family company. 495 A.2d at 672-75. Here, there is no evidence indicating that Perreira, DeSisto, McChesney caused Plaintiff to believe something untrue about her potential claims against Defendant either through a misrepresentation or by their conduct.

This conclusion is consistent with how other jurisdictions have approached equitable estoppel in cases involving child sexual abuse. See, e.g., Zimmerman v. Poly Prep Country Day Sch., 888 F. Supp. 2d 317, 341 (E.D.N.Y. 2012) (finding the plaintiff

25

sufficiently alleged application of equitable estoppel where his parents relied on the school's determination that the plaintiff's allegations were not credible, following a "sham investigation," in not bringing a lawsuit); Anderson v. Holy See, 878 F. Supp. 2d 923, 935 (N.D. Ill. 2012) (denying the application of equitable estoppel where the plaintiff lacked "any allegation that the Bishop has either misrepresented material facts or concealed them from [the plaintiff] at any time"); Zumpano v. Quinn, 849 N.E.2d 926, 929-30 (N.Y. 2006) (finding the plaintiff did "not allege any specific misrepresentation to them by defendants, or any deceptive conduct sufficient to constitute a basis for equitable estoppel"); Doe v. Archdiocese of Cincinnati, 849 N.E.2d 268, 279 (Oh. 2006) (same); Santo B. v. Roman Cath. Archdioceses of N.Y., 861 N.Y.S.2d 674, 676 (N.Y. App. Div. 2008) (declining to apply equitable estoppel where, after informing the defendant's representative of sexual abuse allegations, the plaintiff believed the defendant would investigate his claims even though the defendant did not make any specific promises to that effect).

And if more was needed, to establish that a defendant "lulled" a plaintiff into filing an untimely claim, the plaintiff still must establish that she relied on the defendant's misrepresentation or equivalent conduct in not acting on her rights, and Plaintiff has not done so here. See, e.g., Svensson v. Putnam Inv. LLC, 558 F. Supp. 2d 136, 142 (D. Mass. 2008)

26

(denying motion for summary judgment where it was disputed whether the defendant used the false promise of alternate employment to lull the plaintiff into filing an untimely unlawful termination claim); Martin v. Howard, 784 A.2d 291, 302-03 (R.I. 2001) (concluding the defendants did not "lull" the plaintiff into believing that they would resolve her time-barred claims without a lawsuit because they did not promise to do so; therefore, equitable estoppel did not apply).

For the reasons above, Defendant's Motion is granted with respect to Plaintiff's assertion of equitable estoppel.

## B. Equitable Tolling

Defendant argues that Plaintiff is not entitled to equitable tolling because she did not pursue her claims against it despite recognizing she was abused by Smith and because there were no extraordinary circumstances that justified her delay in filing her lawsuit. Def.'s Mem. 37-41; Def.'s Reply 16-19, ECF No 75. Plaintiff contends equitable tolling should apply because of Defendant's efforts to mislead Plaintiff into not filing her claim. Pl.'s Mem. 20-22. She further posits that the statute of limitations should be tolled until at least November 2018. Id. at 22.

"'[E]quitable tolling is an exception to the general statute of limitations based upon principles of equity and fairness.'" Polanco v. Lombardi, 231 A.3d 139, 155 (R.I. 2020) (quoting Lehigh

Cement Co. v. Quinn, 173 A.3d 1272, 1279 (R.I. 2017)).  "[A] prerequisite to this Court's extension of the statute of limitations based on equitable tolling is either [1] a plaintiff who was not able to discover his or her injury despite diligent efforts or [2] extraordinary circumstances that prevented a plaintiff from complying with the deadline despite using reasonable diligence."  Id. at 155-56; see Lozano v. Montoya Alvarez, 572 U.S. 1, 10 (2014) ("As a general matter, equitable tolling pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action."); Medina v. Whitaker, 913 F.3d 263, 266-67 (1st Cir. 2019).

Under the first option for equitable tolling, the plaintiff must show that she could not discover her injury despite diligent efforts.  Here, the record demonstrates that Plaintiff recognized she was sexually abused by Smith before the statute of limitations ran.  See PSUF ¶¶ 224-27; DSUF ¶¶ 12-16; 32-33, 37-42; Am. Compl. ¶ 31 ("In Spring 2015, during her freshman year, she gained insight and clarity into what SMITH had done to her – how he manipulated her, abused her, took advantage of her, and turned her against her friends and family").  In fact, Plaintiff reported her abuse to her parents, who then reported the abuse to the school.  The school then reported the abuse to PPD, RIAG, and DCYF.  PPD investigated

the allegations.  Plaintiff was aware of her injury well before the statute of limitations expired.

The second option allows for equitable tolling if "extraordinary circumstances" prevented Plaintiff "from complying with the deadline despite using reasonable diligence." Polanco, 231 A.3d at 155-56.  Here, in response to Defendant's argument, Plaintiff asserts extraordinary circumstances exist here:  (1) Plaintiff was referred to McChesney and (2) PAS "took control" of Lewis Roca's representation to "ensure that any suit Plaintiff may eventually bring would be untimely."  Pl.'s Mem. 20-21.

Plaintiff principally relies on Rivera v. Employees' Retirement System of Rhode Island, 70 A.3d 905 (R.I. 2013).  There, the plaintiff, a police officer, missed the thirty-day statutory period for seeking judicial review of the Retirement Board's denial of accidental disability benefits.  The statute of limitations began to run on the day the Board mailed its administrative decision.  Id. at 907.  At the hearing, the Board's chairman stated that the plaintiff had 30 days from the receipt of the notice to file an appeal.  Id. at 907-08.  The letter containing the decision indicated that the 30-day clock began from when the post office indicates the person received it.  Id. at 908.  The Rhode Island Supreme Court held equitable tolling was appropriate given the Board's misstatements and the uncertainty concerning the filing deadline.  Id. at 912-14.  Plaintiff here puts stock in the court's

statement that it bore "in mind all of the circumstances before us." Id. at 913.

Rivera is distinguishable.  There, the extraordinary circumstances that required equitable tolling were two erroneous statements that were explicitly made by an agency on which the plaintiff relied.  Id.  Here, however, Plaintiff has not identified any statements misinforming her of the statute of limitations or other facts that misled Plaintiff from pursuing a cause of action despite diligent efforts.

Even if the Court accepted Plaintiff's argument that PAS directing her to McChesney who then directed her to Lewis Roca constitutes "extraordinary circumstances," Plaintiff's argument falls short.  It is Plaintiff's position that the statute of limitations should be tolled from February 2017 through November 2018, at a minimum, or to December 2020 at a maximum.  In November 2018, her claims would have been viable for eight more months.  If the statute of limitations were tolled to this point or after, the 2019 Amendment would apply, effectively extending the statute of limitations for another thirty-five years.[16]

_____

[16] Under the 2019 Amendment, the statute of limitations for claims against non-perpetrator defendants are extended for claims that are "not otherwise time-barred."  R.I. Gen. Laws § 9-1-51. According to Plaintiff's argument, if the statute of limitations is tolled to at least November 2018, her claims would not have been time-barred when she filed her claim in December 2020.  Pl.'s Mem. 22.

But Plaintiff's attempt to come up with a date range for the tolling period lacks a factual basis and appears arbitrary. According to Plaintiff, equitable tolling should begin February 2017 because that is when PAS began paying Plaintiff's legal bills. Pl.'s Mem. 22.  Lewis Roca's representation ended in November 2017 when Collins closed out the matter.  And there is no evidence in the record suggesting Plaintiff interacted with anyone associated with PAS beyond then.  Plaintiff offers no factual explanation or legal authority for why Plaintiff is entitled to at least another year of equitable tolling beyond when Collins closed out the matter.

Therefore, because Plaintiff does not provide a sufficient factual or legal justification to toll the statute of limitations to at least November 2018, Defendant's Motion is granted with respect to Plaintiff's assertion of equitable tolling.

## C. Fraudulent Concealment

Defendant argues that summary judgment is appropriate for Plaintiff's assertion that the statute of limitations should be tolled under the fraudulent concealment statute because there was only one communication between anyone at PAS and Plaintiff.  See Def.'s Mem. 16-18.  Plaintiff, on the other hand, asserts that a reasonable jury could find that PAS "engaged in misconduct concerning the very filing of an action against it."  Pl.'s Mem. 23.  According to Plaintiff, the attorneys at Lewis Roca were

"obligated to inform [Plaintiff] if [other litigation] matters [that] exist[ed] and discuss with her whether it would continue [to] represent[] her." Id. Therefore, the statute of limitations should be tolled to November 2018. Id. at 24.

> Under state law, the statute of limitation may be tolled if
>
> any person, liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him or her the existence of the cause of action, the cause of action shall be deemed to accrue against the person so liable at the time when the person entitled to sue thereon shall first discover its existence.

R.I. Gen. Laws § 9-1-20 (emphasis added). To demonstrate that a defendant engaged in fraudulent concealment, the plaintiff must show "that the defendant made an 'express representation or [engaged in] other affirmative conduct amounting in fact to such a representation which could reasonably deceive another and induce him [or her] to rely thereon to his [or her] disadvantage.'" Ryan v. Roman Cath. Bishop of Prov., 941 A.2d 174, 182-83 (R.I. 2008) (quoting Caianiello v. Shatkin, 82 A.2d 826, 829 (R.I. 1951)) (internal edits in original). In other words, "a plaintiff must show: (1) that the defendant made an actual misrepresentation of fact; and (2) that, in making such misrepresentation, the defendant fraudulently concealed the existence of plaintiff's causes of action." Id. at 182 (quoting Kelly v. Marcantonio, 187 F.3d 182, 200 (1st Cir. 1999)). The test makes obvious that "[m]ere silence or inaction on the part of the defendant does not constitute actual

misrepresentation in this context." Id.

Plaintiff failed to meet her burden in rebutting Defendant's argument that § 9-1-20 has no application here as a matter of law. As discussed above, Plaintiff was aware she was abused. This is evidenced by her efforts – before the statute of limitations ran – to inform her parents of what had occurred, her parents' steps to inform the administrators at PAS, and PAS's decision to inform law enforcement. Given Plaintiff's awareness of what Smith had done to her, there was nothing for Defendant to conceal.

But assuming Plaintiff was not aware of her claim, misrepresentations that would entitle a plaintiff to tolling under the fraudulent concealment statute include making Plaintiff believe she did not have a claim against PAS, that she was not actually sexually abused by Smith, or that she could file a claim at any time. See Houllahan, 296 A.3d at 725. In this case, Plaintiff only communicated with anyone at PAS on May 2, 2015, when Perreira asked questions about Plaintiff's emails with Smith and his use of an alias. Thereafter, only Plaintiff's parents communicated with anyone at PAS and Plaintiff communicated with PAS's agent, McChesney.[17] There is no evidence in the record to

---

[17] Though the Rhode Island Supreme Court has not addressed whether there can be fraudulent concealment through a Plaintiff's parents, it need not be addressed here because, as Plaintiff alleges, Plaintiff was aware that she was sexually abused. See Polanco, 231 A.3d at 154.

suggest any PAS administrator or agent made a misrepresentation about the statute of limitations to Plaintiff or her parents.  Even more, contrary to Plaintiff's assertion, there is no evidence, even in a light most favorable to Plaintiff, reflecting that DeSisto instructed Collins to keep her representation strictly to the TRO.  Compare PSUF ¶¶ 301-03, with DXWW at 125-26, 130, 177.  The record reflects that DeSisto made it clear to Collins that PAS was only going to pay for legal work associated with the TRO against Smith.  The testimony by Collins that she found the conversation "unusual" could be chalked up to her inexperience, but it was not an instruction or demand to limit the representation of Plaintiff by Lewis Roca.  PSUF ¶ 301 (quoting DXWW at 124).  Accepting Plaintiff's argument that the attorneys at Lewis Roca had an obligation to inform her of a potential cause of action against Defendant, this obligation was outside of PAS's control and is the subject of Plaintiff's lawsuit against the firm.  See Compl. ¶¶ 18-19, 28-45, Doe v. Lewis Roca Rothgerber Christie LLP, C.A. No. 20-cv-01365 (D.N.M. Dec. 30, 2020), ECF No. 1-2.  PAS may well have known and even expected that Plaintiff would sue.  But they took no affirmative steps to conceal information, confuse, or deceive Plaintiff.  PAS had no legal duty to give Plaintiff a road map of how to sue them.

In sum, the fraudulent concealment statute cannot toll Plaintiff's claims as a matter of law and, therefore, Defendant's

Motion is granted with respect to this issue.

## IV. CONCLUSION

Plaintiff smells a rat in the facts of this case: the decision by PAS to contact the Freeh Group, which led to McChesney and then to Lewis Roca – all firms that are associated with representing the Catholic Church in sexual abuse matters – is more than coincidence. Plaintiff's suspicions are understandable especially given the history of denial, cover up, and obfuscation by the Church in the wake of an ongoing epidemic of sexual abuse revelations. Yet the Court can find no factual basis – as opposed to speculation about winks and nods and secret agreements – that would justify the employment of the extraordinary equitable tools Plaintiff asks the Court to apply. Because the Court's hands are constrained by state law, for the reasons explained above, Defendant's Motion for Summary Judgment, ECF No. 60, is GRANTED. Judgment shall enter accordingly.


IT IS SO ORDERED.


_WESmith_
_____
William E. Smith
District Judge
Date: February 9, 2024